## IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**WEST VIRGINIA HCR MANORCARE FACILITIES, ET AL.,**
**Petitioners Below, Petitioners**

**FILED**
**May 23, 2024**
ASHLEY N. DEEM, DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**v.)  No. 23-ICA-207**

**WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,**
**BUREAU FOR MEDICAL SERVICES,**
**Respondent Below, Respondent**

### MEMORANDUM DECISION

Petitioners West Virginia HCR Manorcare Facilities, Inc., et al. (collectively "HCR") appeal the April 24, 2023, decision of the Commissioner of the Bureau for Medical Services ("BMS"), which adopted verbatim, the January 18, 2023, recommended decision of the hearing examiner for the West Virginia Department of Health and Human Resources ("department").[1] Respondent BMS filed a response in support of the decision.[2] HCR filed a timely reply. The issue on appeal is whether BMS adequately followed a previous mandate by the Supreme Court of Appeals of West Virginia ("SCAWV") in allowing an additional $50,000 in allowable costs per HCR facility.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds that there is error in the department's decision but no substantial question of law. This case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure for reversal in a memorandum decision. For the reasons set forth below, we reverse the April 24, 2023, decision of BMS, and this case is remanded for further proceedings consistent with this decision.[3]

---

[1] This Court acknowledges the department's reorganization.

[2] HCR is represented by Gordon Copland, Esq., and Kristen Andrews Wilson, Esq. BMS is represented by Patrick Morrisey, Esq., Lindsay S. See, Esq., and Gary L. Michels, Esq.

[3] Oral argument was held before this Court on April 2, 2024, pursuant to Rule 19 of the West Virginia Rules of Appellate Procedure.

This is an appeal from an administrative order issued following a hearing held as a result of a remand mandate issued by the SCAWV in *Heartland of Beckley WV, LLC v. Bureau for Med. Servs.*, No. 15-0595, 2016 WL 6248620 (W. Va. Oct. 26, 2016) (memorandum decision) ("*Heartland I*"). Much of the factual background prior to the hearing on remand is gleaned from that decision.

HCR is a private, for-profit corporation, operating nursing homes and assisted living facilities throughout the United States. This litigation focuses on Medicaid reimbursement payments for seven locations HCR was operating in West Virginia in 2012.[4] BMS is the state agency responsible for administering West Virginia's Medicaid Program. Pursuant to this authority, BMS drafted the State Medicaid Plan ("State Plan"), a comprehensive document which outlines the scope of expenses that may be reimbursable to nursing facilities. Under the State Plan, nursing facilities are reimbursed for their "allowable" costs, which include "liability insurance" expenses. In 2012, the State Plan did not specifically define or otherwise provide guidance as to the type of expenses properly included in a nursing facility's "liability insurance" expenses. The State Plan also did not mention whether insurance deductibles or liability claims paid by nursing facilities were reimbursable as allowable costs.

BMS uses the following procedure to determine a nursing facility's reimbursement under the Medicaid program. First, it requires West Virginia nursing facilities to submit a report twice a year (once in June and again in December) in which the nursing facilities outline their allowable costs. Then, the nursing facilities are grouped into two categories: one category for small bed facilities (0–90 beds) and another for large bed facilities (91 plus beds). Within each category, nursing facilities are ranked from highest to lowest, according to the amount of allowable costs per bed. Finally, a "CAP," or a ceiling, is set at the ninetieth percentile of each category's ranking. BMS does not reimburse nursing facilities for any amount exceeding the CAP in that nursing facility's category. In addition to the CAP, BMS may audit a nursing facility's cost report.

HCR engaged in two practices that ultimately gave rise to the underlying litigation: (1) when sued for negligence, it would sometimes pay claims within its $10,000,000 liability insurance deductible; and (2) it would include the claims it paid as a "liability insurance" expense in its cost reports to BMS. BMS contends it did not know HCR was engaging in this practice.

BMS claims it started to pay closer attention to HCR's cost reports in 2010, after noticing a dramatic increase in HCR's liability insurance expenses. Between 2010 and June 2012, HCR was among West Virginia's highest reporters of allowable costs. Because HCR

---

[4] HCR has since sold all of these locations and no longer holds business interests in West Virginia.

operated six of the fifty-one large bed nursing facilities in West Virginia, its reported expenses have the potential to drive up the CAP for large bed nursing facilities. The effect of HCR's reported expenses on the June 2011 CAP caused the CAP to rise 11.8% from December 2010, when HCR was not included in the CAP. The following period, December 2011, HCR contributed to the CAP rising an additional 38%.

In June 2012, HCR's reported expenses continued to increase. HCR reported the following liability insurance costs for its seven nursing facilities: (1) Beckley: $8,087 per bed; (2) Clarksburg: $8,108 per bed; (3) Keyser: $8,112 per bed; (4) Martinsburg: $8,129 per bed; (5) Kingwood: $8,115 per bed; (6) Rainelle: $8,113 per bed; and (7) Charleston: $8,079 per bed. By comparison, the highest reporting non-HCR large bed facility incurred liability insurance costs of $2,367 per bed for the same reporting period. HCR's six large bed facilities reported 62.5% of the liability expenses for the fifty-one large bed facilities in West Virginia.

Because of the amount of HCR's reported liability insurance expenses, BMS subjected HCR's June 2012 cost report to a desk review audit. BMS claims it was during this desk review that it first learned HCR included paid legal claims within its deductible as a liability insurance expense. Upon learning this information, BMS eliminated *all* paid legal claims from HCR's cost reports through a "desk review adjustment." As a result of the desk review adjustment, HCR's seven facilities had some of West Virginia's lowest allowable costs per bed for liability insurance for the June 2012 reporting period.

In its desk review adjustment of HCR's cost report, BMS did not provide a reason for eliminating *all* of HCR's paid legal claims, as opposed to reducing them to a level determined to be reasonable. BMS made no inquiry into the structure of HCR's insurance program or its deductible, the nature of the paid legal claims included in HCR's cost report, or the practice of other similar nursing facilities related to paid legal claims in their cost reports.

HCR sought administrative review of BMS's desk review adjustment. On June 17, 2013, BMS issued a document/desk review decision finding it did not err. HCR then requested an evidentiary hearing on the matter. At the hearing, HCR argued that federal Medicare regulations presume that liability insurance costs, including deductibles, can be reimbursed. Because West Virginia's State Medicaid Plan was silent on this issue, HCR contended BMS should have relied upon the federal Medicare regulations. The hearing examiner entered a recommended decision affirming BMS's decision to eliminate all of HCR's paid legal claims within its liability deductible from its June 2012 cost report. In his order, the hearing examiner found that federal Medicare regulations and cost principles regarding liability insurance expenses were not intended to apply to West Virginia's Medicaid program and were not controlling in this case. BMS adopted the hearing examiner's recommended decision without modification.

HCR petitioned the Circuit Court of Kanawha County for a writ of certiorari. In denying HCR's writ, the circuit court acknowledged that when Medicaid regulations are silent, Medicare cost principles and regulations apply. However, and without explanation, the circuit court stated: "HCR has . . . not explained how it is entitled to the presumption created by [Medicare]." HCR appealed the circuit court's order to the SCAWV.

On appeal, the SCAWV found that pursuant to § 2162.5 of Medicare's Provider Reimbursement Manual ("PRM"), "a nursing facility may include first dollar losses within its liability insurance deductible as an allowable cost, provided its aggregate deductible is no greater than ten percent of its net worth." *Heartland I*, at *5. It was also determined that PRM § 2162.5 "presumes HCR to have been reasonable in including its paid legal claims within its liability insurance deductible as an allowable cost in its June 2012 cost report." *Id.* Further, according to PRM § 2100, "[a]ll payments to providers of services must be based on the reasonable cost of services[.]" And it found that PRM § 2102.1 defined "Reasonable cost," in part, as:

> [P]roviders are reimbursed the actual costs of providing high quality care, regardless of how widely they may vary from provider to provider, *except* where a particular institution's costs are found to be *substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors*.

(Emphasis added).

The *Heartland I* Court also noted that under 42 C.F.R. § 413.9(c), nursing facility reimbursement under Medicare is: "subject to a limitation if a particular institution's costs are found to be substantially out of line with other institutions in the same area that are similar in size, scope of services, utilization, and other relevant factors." *Id.* It then concluded that BMS erred by eliminating *all* of HCR's paid legal claims from its June 2012 cost report, noting:

> Those costs, which are reasonable, are allowable under PRM § 2162.5 up to a certain amount (essentially, up to ten percent of HCR's net worth). However, PRM § 2162.5 is subject to 42 C.F.R. § 413.9(c), which prohibits a nursing facility's costs from being "substantially out of line" from comparable institutions.

*Id.*

As a result, *Heartland I* reversed and remanded the circuit court's order, concluding:

> Accordingly, we reverse and remand the circuit court's May 16, 2015, order affirming [BMS's] decision to eliminate, in total, *all* of HCR's paid legal

4

claims from its June 2012 cost report. On remand, the parties should be allowed to introduce evidence as to whether HCR complied with the provisions of PRM § 2162.5 and 42 C.F.R. § 413.9(c)'s substantially out of line provision.

The circuit court erred by failing to apply pertinent Medicare regulations and cost principles in resolving this matter. Thus, we reverse the circuit court's order and remand this case for further proceedings consistent with this decision.

*Id.* at *6.

According to the record, a second administrative hearing was held (first remand hearing) in May 2018. On November 7, 2018, the hearing examiner provided copies of his recommended decision to the parties. No parties objected to the same and on November 15, 2018, the BMS Commissioner adopted the recommended decision, verbatim. In this decision, the hearing examiner concluded that BMS did not apply the regulations outlined in *Heartland I* and, therefore, BMS had failed to comply with the SCAWV's mandate. Thus, the hearing examiner found that the matter had to be remanded so that BMS could apply the methodology set forth in *Heartland I*. HCR did not appeal this decision to circuit court. Instead, approximately twenty-five months later, it filed a writ of prohibition with the SCAWV, seeking to halt enforcement of the November 2018 decision. On May 14, 2021, the SCAWV issued *State ex rel. Heartland of Beckley WV, LLC v. West Virginia Bureau for Medical Services*, No. 20-0961, 2021 WL 1944395 (W. Va. May 14, 2021) (memorandum decision) ("*Heartland II*"). *Heartland II* denied the writ of prohibition, finding that HCR took no action following entry of the November 2018 decision to protect its interests, nor did it object to the recommended decision prior to its entry.

A third evidentiary hearing (second remand hearing) was held on October 19, 2022. The parties agreed that the record from the prior proceedings in this case should be incorporated as part of the record. The hearing examiner also found that the decisions in *Heartland I* and *II* were the law of the case, that he was bound by the remand in *Heartland I*, and that *Heartland II* permitted him to apply the findings made in the November 2018 BMS decision. During the October 19, 2022, hearing the examiner considered the testimony of Jeanne Snow, Martin Allen, and expert witness, Greg Gibbs. Each of these witnesses was found to be credible.

Ms. Snow was formerly the Director of Rate Setting and Provider Reimbursement for BMS and testified in each of the administrative hearings in this case. Ms. Snow presently works as a rate setting consultant. Ms. Snow explained that BMS does not track nursing facilities based on their scope of services or utilization. BMS only tracks nursing facilities according to size, dividing such facilities into two categories: (1) the small bed group which includes facilities with one to ninety beds; and (2) the large bed group which

5

includes those facilities with ninety-one or more beds. At the time of the events at issue in this matter, HCR operated six large bed nursing home facilities and one small bed nursing home facility in West Virginia. Ms. Snow further explained that facilities ordinarily care for the needs of their residents comprehensively. Thus, there is no reason to track their scope of service or utilization.

Ms. Snow stated that the per diem rate for each facility is calculated by dividing the total allowable costs by the total number of patient days. The per diem rates are sorted from high to low and the ninetieth percentile is calculated. This ninetieth percentile calculation becomes the maximum or "CAP," a ceiling used by BMS to monitor costs. It was noted that following BMS' desk review audit of HCR, its June 17, 2013, decision calculated the CAP to be $1,433 per bed and allowed the following amounts for liability expenses at HCR's facilities:

Heartland of Beckley - $287,937
Heartland of Charleston - $263,584
Heartland of Keyser - $174,767
Heartland of Clarksburg - $171,902
Heartland of Martinsburg - $171,902
Heartland of Preston County - $171,902
Heartland of Rainelle - $85,951[5]

Ms. Snow explained that only 81.23% of the reported costs, or a lump sum of $53,285,372 was removed, with that discount then applied to the individual facilities. After 81.23% of HCR's settlement costs were excluded from liability expenses, HCR's costs were included in calculating the CAP. The CAP calculation for the large bed group before 81.23% of NCR's settlement costs were excluded was $60.60. However, after those settlement costs were excluded, the CAP for the large bed group was calculated at $25.32, an amount comparable to the established CAP for prior periods.

Regarding her actions in response to *Heartland I*, and the directive to look at "other factors," Ms. Snow testified that she compared HCR to another single nationwide healthcare chain that was doing business in West Virginia at the time, Genesis HealthCare ("Genesis"). At the time of the January to June 2012 cost report, Genesis was operating nine large bed nursing facilities and eighteen small bed nursing facilities in West Virginia. Ms. Snow observed that the liability insurance costs reported by HCR were much higher than any of the Genesis facilities. HCR reported a total of $7,024,330 in liability insurance

---

[5] At the October 2022 hearing, HCR stated it was no longer challenging the rate for the Rainelle location.

costs for its six large bed facilities, whereas Genesis reported a total of $776,032 in liability insurance costs for its nine large bed facilities. The fifty-one facilities in the large bed group claimed a total of $11,208,875 for liability insurance costs with HCR's facilities making up 62.5% of the total amount. When including HCR's only small bed facility, Rainelle, HCR's total liability insurance expenses for all seven of its facilities totaled $7,511,619. Conversely, the combined total for all twenty-five of Genesis' facilities only totaled $1,788,742.

Considering it to be another directive under *Heartland I*, Ms. Snow also prepared a new cost report to illustrate what calculations would have been made had an adjusted liability cap been in effect for the January 2012 and June 2012 reporting periods. In this calculation Ms. Snow added an additional $50,000 in liability to each of HCR's facilities and recalculated the reimbursement rate. This resulted in HCR receiving an additional total payment of $224,782.49.[6]

Mr. Allen is HCR's Vice President of Revenue Cycle and Reimbursement. According to Mr. Allen, HCR's company net worth at the end of 2011 was $1,402,310,000, and the company's net worth at the end of 2012 was $1,396,044,000. The hearing examiner noted that ten percent of the 2011 net worth would have been $140,231,000 and at the end of 2012 it would have been $139,604,400.

Mr. Gibbs is a CPA who was qualified as an expert regarding Medicare and Medicaid reimbursement for healthcare facilities in West Virginia. Mr. Gibbs testified that the established CAP methodology in the PRM was the most appropriate methodology for determining whether reported or claimed costs are "substantially out of line." The hearing examiner found Mr. Gibbs' testimony to be consistent with Mr. Lane Ellis, a CPA who appeared as an expert witness at the original administrative hearing. Mr. Ellis had testified that PRM § 2162.5 provides a presumptive test that a facility's liability costs are reasonable if they are under the ten percent limit. It was determined that both Mr. Gibbs' and Mr. Ellis' testimony reflected that the CAP established by BMS during the previous rate-setting period should have established a floor for the CAP during the relevant period at issue in this case.

HCR's contention in each of the administrative hearings was that BMS improperly disallowed legal liability claims within HCR's liability insurance deductible which it paid during the January 1, 2012, and June 30, 2012, cost reporting periods. Thus, the June 17,

---

[6] It was noted that during the subject reporting periods, Genesis was not self-insured, and that HCR would pay negligence claims within its $10,000,000 liability insurance deductible. The single largest claim reported by HCR for this time period was $1,625,577.

2013, decision failed to establish a properly calculated CAP for payment of services which it provided under Medicaid. However, BMS maintained the position that the state and federal Medicaid scheme for reimbursement authorized its determination to decrease HCR's claims for legal liability expenses to a reasonable amount.

As adopted by the Commissioner, the hearing examiner's decision found that neither HCR's largest reported claim ($1,625,577) nor the aggregate total of its reported claims ($7,511,619), exceeded the ten percent of HCR's net worth. However, the hearing examiner found that *Heartland I* placed an additional obligation upon BMS to consider the Medicare regulations limited reimbursement to "reasonable costs." Thus, even though HCR established that its liability costs were within the ten percent threshold, the hearing examiner found that here BMS had established that the costs reported by HCR were not reasonable under PRM § 2100 or 42 C.F.R. § 413.9(c) because HCR's paid claims were substantially out of line with amounts expended for the same purposes by other comparable facilities in West Virginia, namely only Genesis. It was also determined that *Heartland I* clearly set forth that the PRM's ten percent requirement was subordinate to the "substantially out of line" provision in 42 C.F.R. § 413.9(c).[7]

The decision found that BMS' determination that HCR's reported liability insurance claims were substantially out of line was supported by the evidence and that it was neither arbitrary nor capricious. Interestingly, the decision then stated:

> The rationale for [BMS's] further action in adding back $50,000.00 per facility was not satisfactorily explained, although it appears to be an effort to ameliorate the denial of HCR's out of line liability costs to some degree. Even if this amount, which increases the amount of reimbursement to which HCR is now entitled, is an arbitrary number, this gratuitous gesture does not undermine [BMS's] rationale for concluding that the original amounts claimed by HCR were substantially out of line in violation of C.F.R. § 413.9(c). Because HCR's liability claims were substantially out of line before [BMS] added $50,000.00 to the calculation, this action does not invalidate the agency's initial determination.

---

[7] This decision rejected HCR's "judicial hellhole" defense to justify its claims of high liability costs. It also rejected the alternative CAP calculation that HCR's experts had provided throughout the litigation, finding that those alternatives presupposed that expenditures resulting from adverse jury verdicts and settlements in compromise of lawsuits against nursing home operators were a necessary business cost, and that the record clearly showed that BMS was not knowingly paying for those costs before this dispute arose. However, the decision does not discuss who these experts were, what the proposed methodologies were, etc. Instead, they are only referenced in passing.

Then in its conclusions of law, the decision further stated:

23. Had [BMS] not reduced HCR's claimed liability costs by 81.32%, before adding back $50,000 per HCR healthcare facility, the agency would not have complied with the federal mandate that reimbursement rates be reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers. *See* 42 C.F.R. §§ 447.253(b)(1) & 413.9(c).

24. By comparing HCR's reported liability costs for its six large bed facilities with another national healthcare business which operated nine large bed nursing home facilities in West Virginia, and adding an additional $50,000 in allowable liability expenses to each of HCR's facilities and recalculating the rate to approve $224,782.49 in additional Medicaid costs to HCR, BMS fully complied with the spirit and intent of the Supreme Court's remand and mandate in *Heartland I.*

Ultimately, the decision as adopted by the Commissioner upheld BMS's additional reimbursements to HCR for $224,782.49 and denied HCR's appeal. This appeal followed.

We are guided by the following standard of review:

The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority or jurisdiction of the agency;
(3) Made upon unlawful procedures;
(4) Affected by other error of law;
(5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 29A-5-4(g) (2021); *accord* W. Va. Code § 16-1-22a (2023) (stating that the exclusive remedy for judicial review of Board decisions is governed by West Virginia Code § 29A-5-4). In reviewing decisions by administrative agencies, "[t]he 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 444, 473 S.E.2d 483, 485 (1996).

9

On appeal, HCR argues numerous assignments of error. However, the crux of HCR's argument is that BMS's decision allowing an additional $50,000 in allowable costs per facility is arbitrary and capricious and fails to properly apply the mandate of the SCAWV in *Heartland I*. HCR asserts that the BMS decision for adding an additional $50,000 in allowable costs was not the result of any assessment that was based upon when costs become "substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors." PRM § 2102.1. We agree.

The SCAWV has stated that under the mandate rule

[a] [lower] court has no power, in a cause decided by the Appellate Court, to re-hear it as to any matter so decided, and, though it must interpret the decree or mandate of the Appellate Court, in entering orders and decrees to carry it into effect, any decree it may enter that is inconsistent with the mandate is erroneous and will be reversed.

*State ex rel. Frazier & Oxley, L.C. v. Cummings*, 214 W. Va. 802, 808, 591 S.E.2d 728, 734 (2003) (citations omitted). Further, when an appellate court "remands a case…the remand can be either general or limited in scope. Limited remands explicitly outline the issues to be addressed…and create a narrow framework…[g]eneral remands, give [] authority to address all matters as long as remaining consistent with the remand." *Id.* at 809, 591 S.E.2d at 735 (citation omitted). Accordingly, on remand, a lower court or agency "must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Id.* at 810, 591 S.E.2d at 736 (citation omitted).

On remand, BMS was explicitly tasked with allowing the parties to introduce evidence "as to whether HCR complied with the provisions of PRM § 2162.5 and 42 C.F.R. § 413.9(c)'s substantially out of line provision." *Heartland I*, at * 6. As noted above, BMS determined that neither HCR's largest reported claim ($1,625,577) nor the aggregate total of its reported claims ($7,511,619), exceeded ten percent of HCR's net worth. This arguably satisfies the requirement to address the provisions within PRM § 2162.5. However, the $50,000 addition in allowable costs per facility has no rationale behind it. As noted above, the decision addresses the $50,000 figure as follows:

The rationale for [BMS's] further action in adding back $50,000.00 per facility was *not satisfactorily explained*, although it appears to be an effort to ameliorate the denial of HCR's out of line liability costs to some degree. *Even if this amount*, which increases the amount of reimbursement to which HCR is now entitled, *is an arbitrary number, this gratuitous gesture does not undermine [BMS's] rationale for concluding that the original amounts claimed by HCR were substantially out of line* in violation of C.F.R. §

10

413.9(c). Because HCR's liability claims were substantially out of line before [BMS] added $50,000.00 to the calculation, this action does not invalidate the agency's initial determination.

(Emphasis added).

As outlined above, even the BMS decision acknowledges that this $50,000 figure is "not satisfactorily explained." Without any explanation of how this $50,000 is accurate, this Court is left to speculate as to how it was determined. Further, as emphasized in the decision, there is no demarcation point to determine at what point HCR's costs became "substantially out of line." Rather, the "substantially out of line" point was determined by looking at a single somewhat similar facility, Genesis.

As the SCAWV has stated:

Without findings of fact and conclusions of law, [an appellate court] is unable to determine the basis for the court's decision and whether any error has occurred. Consequently, in cases where there is an absence of adequate factual findings, it is necessary to remand the matter to the [department] to state, or at a minimum, amplify its findings so that meaningful appellate review may occur.

*Mullins v. Mullins*, 226 W. Va. 656, 662, 704 S.E.2d 656, 662 (2010). This court has previously applied this rationale to administrative agency decisions. *See e.g., Logan Gen. Hosp., LLC v. Boone Mem'l Hosp., Inc.*, No. 23-ICA-134, 2023 WL 7203357, at *3 (W. Va. Ct. App. Nov. 1, 2023) (memorandum decision) (vacating and remanding an administrative agency decision for entry of a more detailed order). Therefore, we must remand this decision back to BMS for entry of a new order with a satisfactory explanation of the $50,000 additional allowable costs or with another alternative analysis and calculation consistent with the SCAWV mandate.[8] This Court is not necessarily concluding that the $50,000 figure is inaccurate, we are only remanding this decision for a full detailed explanation of how this figure was determined. On remand this figure may change, or it may stay the same.

---

[8] This Court is cognizant that this matter only concerns roughly a six-month period between January 1, 2012, to June 1, 2012. However, with the arbitrary $50,000 figure adopted by BMS, this case must once again be remanded for a satisfactory explanation. If upon remand, BMS is unable to adopt and support a reasonable adjustment in accordance with the mandate, on subsequent review we may be left with no option but to adopt HCR's experts' offerings by default.

Further, on remand, BMS must look at more than just one institution. As outlined by Code of Federal Regulations Ch. 42, § 413.9(c) (1986), "institutions" is plural and requires more than just looking to a single comparator, namely Genesis, in determining that HCR's costs "are substantially out of line[.]"[9] This Court acknowledges that this may be a very complex and intricate process; however, in no way is the $50,000 in additional costs supported in the record or by the decision of BMS. Additionally on remand, the department must determine or set an appropriate demarcation line below which reimbursement payments would be due.

Accordingly, we reverse the April 24, 2023, decision of the Commissioner of the Bureau for Medical Services and remand this matter for further proceedings consistent with this decision.

Reversed and Remanded.

**ISSUED:** May 23, 2024

**CONCURRED IN BY:**

Chief Judge Thomas E. Scarr
Judge Charles O. Lorensen
Judge Daniel W. Greear

---

[9] Specifically, Code of Federal Regulations Ch. 42, § 413.9(c)(2) states "if a particular institution's costs are found to be substantially out of line with other institutions in the same area that are similar in size, scope of services, utilization, and other relevant factors."